IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | UNDER SEAL |
| | ) | |
| v. | ) | Criminal No. *1:09 MJ 327* |
| | ) | |
| JAMES WILBUR FONDREN, JR. | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Robert M. Gibbs, being duly sworn, depose and state as follows:

### Introduction

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and I have been

so employed for six years. I am currently assigned to a Counterintelligence squad of the

Washington Field Office. My initial training at the FBI Academy in Quantico, Virginia,

included specialized training in national security investigations, and I have received additional

specialized training in national security matters since that time. Throughout my tenure as an

agent, I have been assigned to the investigation of national security matters, and I have

participated in arrests and in the execution of search warrants during those investigations.

2. This affidavit is submitted in support of a criminal complaint charging JAMES

WILBUR FONDREN, JR., a government employee, with conspiracy to communicate classified

information to an agent or representative of a foreign government, in violation of Title 50,

United States Code, Section 783(a) and Title 18, United States Code, Section 371. As set forth

below, there is probable cause to believe that from in or about November 2004 to on or about

February 11, 2008, FONDREN, while serving as an employee of the United States Department

of Defense (DOD), unlawfully and knowingly conspired with Tai Shen Kuo and others, known

and unknown, to communicate classified information to another person whom FONDREN had

reason to believe was an agent or representative of a foreign government.

3. Section 783(a) of Title 50, United States Code, provides, in pertinent part, that:

It shall be unlawful for any . . . employee of the United States . . . to communicate
in any manner or by any means, to any other person whom such . . . employee
knows or has reason to believe to be an agent or representative of any foreign
government, any information of a kind which shall have been classified . . . by the
head of any such department [or] agency . . . with the approval of the President []
as affecting the security of the United States, knowing or having reason to know
that such information has been so classified, unless such . . . employee shall have
been specifically authorized . . . to make such disclosure of such information.

4. This affidavit is based on my personal knowledge, information conveyed to me by

other law enforcement officers, interviews with cooperating witnesses, and my review of

documents and records obtained during the course of the investigation. It is also based on

evidence obtained pursuant to court-authorized electronic surveillance. This affidavit contains

information necessary to establish probable cause, but does not include every fact known by me

or known by the government.

## JAMES WILBUR FONDREN, JR.

5. From in or about August 2001 through February 11, 2008, FONDREN was the

Deputy Director of the United States Pacific Command (PACOM) Washington Liaison Office.

FONDREN's office was located in the Pentagon, in Arlington, Virginia, within the Eastern

District of Virginia. FONDREN held a Top Secret security clearance with access to Sensitive

Compartmented Information and worked in a Sensitive Compartmented Information Facility

(SCIF). In his work cubicle, FONDREN had an unclassified computer with access to the

2

internet and a classified computer with access to United States government information classified up to the Top Secret level.

6.  FONDREN retired from active duty as a Lieutenant Colonel in the United States Air Force in May 1996.  In approximately February 1998, he began providing consulting services, under the business name Strategy, Inc., from his home in Annandale, Virginia, within the Eastern District of Virginia.  FONDREN's sole client for his consulting business was an acquaintance by the name of Tai Shen Kuo.  FONDREN continued to provide consulting services for Kuo even after he began working for PACOM in August 2001.

### Tai Shen Kuo

7.  Tai Shen Kuo was a business associate and friend of FONDREN.  Kuo is a naturalized United States citizen who was born in Taipei, Taiwan.  Kuo lived primarily in New Orleans, Louisiana, and had a second home in Houma, Louisiana.  Kuo had a variety of business interests, primarily involving furniture, in the United States and the People's Republic of China (PRC), and he maintained an office in Beijing, PRC.  Kuo took steps to establish at least two companies in the United States to pursue contracts related to the United States' sale of defense technology to Taiwan.  Kuo cultivated and maintained relationships with several current United States government employees, including FONDREN, former United States government employees, and certain government contractors.  Kuo did not hold a United States security clearance at any time, and therefore, was not entitled to view or possess classified information.

8.  The investigation revealed that Kuo maintained a close relationship with an official of the PRC government (hereinafter "PRC Official").  Kuo provided the PRC Official with classified United States government information obtained from FONDREN and, separately, from another DOD employee, Gregg William Bergersen.  The investigation further revealed that the

3

PRC Official directed Kuo, giving him specific instructions, via telephone, e-mail, and in person, as to what information and documents to collect and how to deliver them to the PRC. Kuo used various forms of trade craft to communicate covertly with the PRC Official and to deliver information and documents obtained from FONDREN and Bergersen to the PRC Official.

9. On February 11, 2008, Kuo and Bergersen were arrested on espionage charges. In March 2008, Bergersen pled guilty to conspiracy to disclose U.S. national defense information to persons (Kuo) not entitled to receive it, in violation of Title 18, United States Code, Section 793 (d) and (g). In May 2008, Kuo pled guilty to conspiracy to communicate U.S. national defense information to a foreign government (the PRC), in violation of Title 18, United States Code, Section 794 (a) and (c).

10. At the time of his arrest by the FBI, Kuo was staying as a guest in FONDREN's Annandale, Virginia residence. During the execution of a search warrant at this location, FONDREN's home computer was seized. A subsequent review of this computer revealed numerous "opinion papers" written by FONDREN for Kuo. E-mail correspondence maintained on the computer revealed that FONDREN typically provided these documents to Kuo via e-mail.

### FONDREN and the PRC Official

11. The FBI has interviewed Kuo on numerous occasions since his arrest and guilty plea. During these interviews, Kuo provided additional information about his relationship with FONDREN. Kuo introduced the PRC Official to FONDREN in approximately March 1999, when Kuo and FONDREN traveled together through the PRC visiting various tourist attractions. Kuo introduced the PRC Official as a political researcher and consultant to the PRC government. In fact, the PRC Official was an official of the government of the PRC. A review of

4

FONDREN's home computer shows that after their March 1999 introduction, FONDREN periodically corresponded with the PRC Official by e-mail, until at least March 2001.

12. The investigation also revealed that Kuo maintained a close relationship with the PRC Official. The PRC Official regularly directed Kuo to obtain DOD documents and other DOD information from FONDREN, typically referring to FONDREN by the codename "Fang" or simply "F." FONDREN was aware of Kuo's relationship with the PRC Official; however, FONDREN was not specifically informed of the PRC Official's precise status as an official of the PRC, nor was FONDREN aware of the PRC Official's coded requests for Kuo to obtain DOD documents and other DOD information from FONDREN.

### FONDREN Sells Kuo "Opinion Papers"

13. The investigation also revealed that Kuo maintained relationships with various officials from the Taiwan Ministry of Defense and that FONDREN was aware of Kuo's relationship with those officials. According to Kuo, after FONDREN returned to DOD employment, the quality of information provided by FONDREN diminished. In response, the PRC Official suggested Kuo mislead FONDREN into believing that Kuo was collecting DOD information at the direction of Taiwan government officials. During FBI interviews following Kuo's arrest, FONDREN stated that Kuo received requests for information from his "General friends" in Taiwan and Kuo passed on these requests to FONDREN. FONDREN would respond by providing Kuo with the requested information in the form of DOD publications or "opinion papers," which FONDREN believed Kuo was providing to Taiwan military officials. Based upon my review of the evidence developed during this investigation, it is clear that while FONDREN may not have known that Kuo was working as an agent of the PRC, he did believe that Kuo was providing information from FONDREN's classified opinion papers to Taiwan

5

government officials. Thus, FONDREN was providing classified U.S. government information to an agent or representative of a foreign government.

14. Between November 2004 and February 11, 2008, FONDREN provided to Kuo certain DOD documents and DOD information, some of which FONDREN obtained from classified online systems and other sources available to him by virtue of his employment at the Pentagon. FONDREN incorporated DOD information, including classified U.S. government information, into "opinion papers" which were sold to Kuo under the guise of FONDREN's home-based consulting business. According to Kuo, he paid FONDREN between $350 and $800 for each of the opinion papers. Eight of FONDREN's papers have now been reviewed by classification authorities and determined to contain information classified at the Confidential and Secret levels.

### FONDREN's Obligation to Protect Classified Information

15. Pursuant to Executive Order 12958, as amended by Executive Order 13292, national security information is classified as Top Secret, Secret, or Confidential. The designation "Top Secret" applies to information, "the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security." The designation "Secret" applies to information, "the unauthorized disclosure of which reasonably could be expected to cause serious damage to national security." The designation "Confidential" applies to information, "the unauthorized disclosure of which reasonably could be expected to cause damage to national security." Classified information of any designation, may only be shared with persons determined by an appropriate United States government official to be eligible for access to classified information, who have signed an approved non-disclosure agreement, and

6

who possess a need to know.  If a person is not eligible to receive classified information, classified information may not be disclosed to that person.

16.  FONDREN was aware of his obligation and duty not to disclose classified information to unauthorized persons.  Through interviews with FONDREN's former supervisors at PACOM's Washington Liaison Office, I have confirmed that FONDREN was never authorized to disclose classified information to Kuo while employed by PACOM.

17.  In 1996, FONDREN retired from active duty with the U.S. Air Force.  On March 27, 1996, FONDREN signed a document entitled "Security Termination Statement," in which he acknowledged his obligation to protect classified information.  By signing this document, FONDREN also acknowledged that "[c]ommunicating classified information to an agent or representative of a foreign government" would be a violation of certain enumerated criminal statutes, including "Section 783 of Title 50, U.S. Code. "  Moreover, the form signed by FONDREN also states that his ". . . signature on this form is [his] acknowledgment that [he has] been informed of the criminal statutes applicable to espionage and the punishments provided for violation of these statutes."

18.  On or about August 27, 2001, FONDREN became a civilian employee at the Pentagon and was again granted a security clearance by the U.S. government.  In addition to the standard nondisclosure obligations that accompany any security clearance, FONDREN accepted the security obligations that come with access to Sensitive Compartmented Information (SCI). He signed an SCI Nondisclosure Statement, acknowledging his obligation to protect classified information, as well as his understanding that "by being granted access to SCI, special confidence and trust shall be placed in me by the United States Government."

7

19. In addition to classified opinion papers, FONDREN provided Kuo sensitive, but unclassified, DOD publications. One of the DOD documents was an internal antiterrorism publication that was not available to the general public and was marked "For Official Use Only." Two of the DOD documents FONDREN provided to Kuo were internal restricted draft versions of documents that were not yet available to the public, although finalized documents were or are destined for release to the public.

### November 2004 Disclosure of Information Classified Confidential

20. On November 8, 2004, FONDREN sent an e-mail from his classified DOD computer, located in the Pentagon, to a U.S. Army Lieutenant Colonel. The e-mail requested information related to a past U.S. visit by a senior PRC military official. On November 22, 2004, FONDREN received an e-mail response from the Lieutenant Colonel. Attached to the e-mail were two classified intelligence information reports (IIRs) about the senior PRC military official's U.S. visit. The IIRs, both classified Confidential, were written by the Defense Intelligence Agency (DIA). A review of FONDREN's home computer, seized during the search of his Annandale, Virginia residence revealed that on November 24, 2004, FONDREN sent an e-mail from his residence to Kuo with the subject line "Paper You Requested." Attached to the e-mail was an opinion paper entitled "Visit of [senior PRC military official]." A review of the paper revealed excerpts from one of the DIA classified IIRs.

21. In March 2009, FBI personnel showed the IIR and the opinion paper to the Deputy Director for Human Intelligence at DIA. The Deputy Director, an original classification authority, confirmed that, in accordance with the DIA classification guide, the IIR was properly classified at the Confidential level. The Deputy Director also confirmed that FONDREN's opinion paper contained information appearing in the DIA IIR and classified Confidential.

8

### June 2005 Disclosure of Information Classified Secret

22.  On May 27, 2005, FONDREN sent an e-mail to himself on his classified DOD computer, located in the Pentagon. (FONDREN's process of saving important information was to send himself an e-mail rather than saving a document to his computer hard drive). Included in the text of the e-mail was a United States Department of State (DOS) cable classified at the Secret level. A review of FONDREN's home computer revealed that on June 5, 2005, FONDREN sent an e-mail to Kuo from his residence, using his personal e-mail account. The text of the e-mail from FONDREN to Kuo included the following: "Attached is the paper you requested." Attached to the e-mail was an opinion paper entitled "DoD-PLA Defense Consultative Talks." "PLA" refers to the People's Liberation Army, the military arm of the PRC. FONDREN's opinion paper contained near-verbatim excerpts of numerous portion-marked paragraphs from the Secret DOS cable.

23.  In March 2009, FBI personnel showed the DOS cable to the Director of the Office of Chinese and Mongolian Affairs, Bureau of East Asian and Pacific Affairs within the Department of State. The Director, an original classification authority, confirmed that the DOS cable was properly classified at the Secret level. The Director advised that release of this information would reasonably be expected to cause serious damage to the national security of the United States. The Director stated that FONDREN's opinion paper would be classified at the Secret level for the same reasons.

### October 2006 Disclosure of Information Classified Confidential

24.  In late September 2006, the PRC Official sent an e-mail to Kuo that directed him to obtain information about PACOM's assessment of a joint exercise conducted by the United States Navy (USN) and the PLA Navy that had recently taken place near Hawaii. Several days

later, Kuo asked FONDREN to send him PACOM's assessment of the exercise. FONDREN

initially agreed, but then stated, "well, what I have is classified." At Kuo's request, FONDREN

agreed, instead, to write a paper on the exercise.

25. Approximately two days later, Kuo telephoned FONDREN to inquire about the

status of the paper on the USN-PLA exercise. Kuo asked FONDREN to be "very quick"

because "TECO," (a reference to the Taipei Economic and Cultural Office, which functions as a

Taiwan consulate in the United States) would soon have the report, indicating Kuo wanted to

deliver information about the exercise to Taiwan officials before they received it through official

channels.

26. The next day, October 1, 2006, FONDREN sent a paper about the USN-PLA

exercise to Kuo. Kuo telephoned FONDREN that same day and asked whether the paper

contained anything from the PACOM assessment. FONDREN responded that he had forgotten

to include information from the PACOM report. Kuo then asked FONDREN to add to the paper

as much as possible from the PACOM report, and FONDREN agreed. Later that same day,

FONDREN sent a revised opinion paper. Kuo forwarded the revised paper to the PRC Official

the same night. The FBI asked the PACOM Director for Intelligence, an original classification

authority, to review the paper. The Director for Intelligence determined the paper contained

information classified at the Confidential level.

### February 2007 Disclosure of Information Classified Confidential

27. On January 31, 2007, Kuo left a telephone message for FONDREN requesting, prior

to Kuo's impending trip to Taiwan, information regarding a visit to the United States by a senior

PRC military official. Later that day, Kuo asked FONDREN if he had finished the report yet

and then requested that the information be sent to Kuo in Taiwan. On February 17, 2007,

10

FONDREN sent Kuo an e-mail with a paper FONDREN wrote entitled "The Visit of [senior

PRC military official]," detailing that official's February 2007 visit to PACOM.  The FBI

subsequently asked the PACOM Director for Intelligence to review the paper.  The Director

determined the paper contained information classified at the Confidential level.

### March 2007 Disclosure of Internal Draft of DOD Report

28.  In February 2007, Kuo asked FONDREN to obtain a draft copy of an annual DOD

report on the PLA, known as the Annual Report to Congress on Military Power of the People's

Republic of China.  Kuo wanted this report prior to his scheduled trip to Taiwan on March 7,

2007.  On February 24 and February 28, Kuo again asked FONDREN for a draft copy of the

annual DOD report.

29.  A review of e-mail from FONDREN's classified DOD computer revealed that on

March 2, 2007, FONDREN received an e-mail from a DOD colleague.  The e-mail included the

text, "Jim:  As requested."  Attached to the e-mail was a draft copy of the DOD report.

Approximately two hours later, FONDREN replied to the colleague's e-mail, stating, "Thank

you ... I will protect the Report."  Later that evening, Kuo called FONDREN at home and asked

whether FONDREN had found the draft report.  FONDREN replied "I can't talk about uh – that

stuff over the phone."

30.  On March 3 and 4, 2007, Kuo stayed as a guest in FONDREN's Annandale, Virginia

residence.  On March 3, 2007, the following exchange occurred:

FONDREN:   This is the report I didn't want you to talk about over the telephone.

KUO:            Thank you, thank you very much.

FONDREN:   Let people find out I did that, it will cost me my job.

KUO:            Oh, I am sorry.  I am sorry.  I wouldn't say anything.

31. Kuo then asked FONDREN when the annual DOD report was going to be published.

FONDREN responded:

> Don't know.  We know that they are going back and forth and arguing with State
> Department over every little period, every little detail.  So it could be, it could be
> a couple of weeks, it could be a month, you know?  But umm . . . They are . . .
> This is a very, quote, sensitive document.

32. The final version of the DOD report on the PLA was released to the public almost

three months later, on May 25, 2007.  The draft report that FONDREN gave to Kuo contains

numerous items that do not appear in the public version.

### March 2007 Discussion Between Fondren and Kuo about
### Getting Information for Taiwan General

33. During the same visit, FONDREN and Kuo also had the following exchange on

March 3, 2007:

FONDREN:    Well.  It's, it gets, it's harder, because . . .

KUO:        I know, I know.

FONDREN:    Because when you work, when you, now that you work in government,
            you have, you, people say, "Why do you want to know this?"

KUO:        Yeah, yeah.  I know it's hard.

                            *   *   *

FONDREN:    It's all on the internet and under the, uh, it's protected!  You know I went
            to one site and I was trying to find, uh, I don't know … It was an
            acronym, it said JSAMS.  I had no idea what that is, well, I wonder if that
            has manuals, M could be for manuals.  So I tried to go into this thing, and
            it says you know, "identify yourself, put in your password," and it says,
            "your activities will be monitored the whole time you're in here."  You
            know.

KUO:        Oh, no.

                            *   *   *

12

KUO:        See, he, he [a Taiwan General] told me, I this, see, I'm going to see him Monday, Tu…, Wednesday . . .

FONDREN:    Yeah.

KUO:        In Taiwan.  He wants to, he wants to be, he wants to work his way to be a Secretary of Defense for Taiwan.

FONDREN:    Um-hm.

KUO:        MND, that's what that, that's what he's right now he a, the position, they, the position really no power.

FONDREN:    Yeah, right.

KUO:        Is more, it's not civilian position, he's in Taiwan, the, the, the Secretary of Veteran, Veteran Affairs is not civilian position.

FONDREN:    Right.

KUO:        He's still a three-star general.

[Affiant's note:  I believe that as used in the exchange above, "MND" is an acronym for the Taiwan Ministry of National Defense].

34.  On March 4, 2007, FONDREN and Kuo returned to the topic of how difficult it was to gather items while working at the Pentagon.  FONDREN stated the following:

> When you see your friend in Taiwan, the General. . . . Let him know, this is hard to explain, but for me to be able to get some of the information means I have to ask questions and people start asking why I want to know that, you know.  If I needed to know that, I would already know that.  So it is very, very difficult.

Kuo acknowledged FONDREN's concerns and said he was looking only to obtain "official use only" materials, noting specifically that he did not want information that was available to the public.  During the same conversation, Kuo invited FONDREN to travel to Taiwan to meet the General.  FONDREN suggested that he not make such a trip until after leaving his current job, or that he at least wait until his security reinvestigation was concluded.  (Government employees

13

who hold security clearances are periodically reinvestigated to determine whether they should be permitted to retain their clearances.)

### August 2007 Interview of FONDREN by FBI

35.   In August 2007, FBI agents conducted a pretext interview of FONDREN in an effort to evaluate the nature of FONDREN's relationship with Kuo.  The FBI agents told FONDREN they were seeking the assistance of government personnel familiar with Asia.  At the outset of the interview, the FBI advised FONDREN that the nature of the interview was sensitive and confidential, and FONDREN was specifically asked not to discuss the interview openly.  During the interview, FONDREN stated that in 1998 he established his own company providing national security consulting services and that Kuo was a client of FONDREN's company.  FONDREN also discussed his work-related interactions with foreign military officials.  FONDREN said he would never tell anyone anything that they could not research for themselves, and FONDREN said almost everything he provided was from the newspapers.

36.   Two days after the FBI interview, FONDREN, in an apparent attempt to inform Kuo about the FBI's visit, sent Kuo an e-mail which included the following excerpts:

Tai,

I had a strange visit this week by two FBI guys who said that they were from Counter Intelligence …

I met with them and they were more interested in the names of people that I know or talk to.  I told them the truth, that you are a wealthy Asian business man from my home town …

… To be honest, I couldn't determine what they wanted, but I doubt that they are really interested in the political, economic, and security issues affecting Asian countries.

The discussion seemed to be in a bizarre direction, so I wanted you to be aware of my surprise visit in case you get a surprise also!

14

Warm regards,
Jim Fondren

### December 2007 Disclosure of Information Classified Confidential

37.  The investigation revealed that in both 2006 and 2007, the PRC Official directed

Kuo to obtain from FONDREN information about future U.S.-PRC bilateral military exchanges.

In September 2007, Kuo asked FONDREN to write a paper on bilateral exchanges between

PACOM and the PRC.

38.  The investigation further revealed that on December 6, 2007, FONDREN printed a

DOD document from a classified DOD computer system.  The overall document was marked

"Secret."  The DOD document included five bullet points, four of which were marked "FOUO,"

an acronym that means "For Official Use Only;" the fifth bullet point was marked "C," which is

a portion marking that means the information is classified at the Confidential level.  DOD

regulations restrict FOUO materials from being disclosed to the public and require reasonable

steps to avoid disclosure of FOUO materials to unauthorized personnel.

39.  Later that same day, FONDREN sent the four FOUO bullets to his personal e-mail

account.  The text was identical to the original DOD document, and the portion markings

"FOUO" remained unchanged.  In the e-mail, FONDREN included a reworded version of the

fifth bullet and then changed the classification marking from "C" for Confidential to "FOUO."

Approximately four days later, FONDREN sent Kuo an opinion paper entitled, "DOD-PLA

Bilateral Military Meetings," that incorporated information from all five bullets in addition to

other U.S. government information.  The FBI asked the PACOM Director for Intelligence to

review the paper.  The Director determined that FONDREN's paper contained information

classified at the Confidential level, apart from the five bullets referenced above.

40.  At the time of his arrest on espionage charges on February 11, 2008, Kuo was staying as a guest in FONDREN's residence.  Among his possessions, Kuo had a draft copy of a DOD document entitled "The National Military Strategy of the United States of America 2008, Version 5."  The document was marked "Pre-Decisional Working Document – DDS&P Close Hold."  DDS&P is an acronym for the Deputy Directorate of Strategy and Policy within the Joint Chiefs of Staff.

41.  On the day of Kuo's arrest, FONDREN was interviewed by the FBI and informed that Kuo had been arrested at his house.  FONDREN told the FBI he had an unclassified, pre-decisional draft of the National Military Strategy report at his house.  FONDREN said he took the document home because he did not have enough time to read it at work.  FONDREN also said he told Kuo about the report; however, FONDREN falsely claimed that he did not give the draft copy to Kuo.  During a follow-up interview on February 12, 2008, the FBI told FONDREN that the draft National Military Strategy report had been found in the guest room in Kuo's belongings.  FONDREN then admitted he had allowed Kuo to look at the draft document. FONDREN acknowledged the document was pre-decisional and could undergo significant changes prior to its release.  FONDREN said that because the document was unclassified, he felt it was okay for him to share it with Kuo.  After further questioning, FONDREN ultimately admitted that he gave the draft National Military Strategy report to Kuo.  According to FONDREN, he assumed Kuo would provide the document to his Taiwanese General friend.

### Conclusion

42.  Based on the foregoing, I respectfully submit that there is probable cause to believe that from in or about November 2004 to on or about February 11, 2008, in the Eastern District of Virginia and elsewhere, JAMES WILBUR FONDREN, JR, while serving as an employee of the

16

United States Department of Defense, unlawfully and knowingly conspired with Tai Shen Kuo

and others, known and unknown, to communicate classified information to another person whom

FONDREN had reason to believe was an agent or representative of a foreign government, in

violation of 50 U.S.C. § 783(a) and 18 U.S.C. § 371.


Robert M. Gibbs
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this 11th day of May, 2009.

                    /s/
Theresa Carroll Buchanan
United States Magistrate Judge

Theresa Carroll Buchanan
United States Magistrate Judge

17